# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JOHN R. JOHNSON, III,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:17-CV-01446-MHH** |
| | } | |
| **NANCY BERRYHILL,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff John R. Johnson, III seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Johnson's claims for disability insurance benefits and supplemental security income.  After careful review, the Court remands this matter for additional administrative proceedings.

## I.    PROCEDURAL HISTORY

Mr. Johnson applied for a period of disability, disability insurance benefits, and supplemental security income on September 27, 2016.  (Doc. 7-3, p. 11; Doc. 7-6, pp. 2-4; Doc. 7-6, pp. 5-12).  Mr. Johnson initially alleged that his disability began on October 26, 2011.  (Doc. 7-3, p. 11; Doc. 7-6, pp. 2-12).   Mr. Johnson

later amended his onset date to August 26, 2015.  (Doc. 7-3, p. 11; Doc. 7-7, p. 21).  The Commissioner initially denied Mr. Johnson's application.  (Doc. 7-4, pp. 4-5).  Mr. Johnson requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 7-5, pp. 10-11).  The hearing took place on March 23, 2017.  (Doc. 7-3, p. 36).   The ALJ issued an unfavorable decision on April 10, 2017.  (Doc. 7-3, p. 22).  The Appeals Council declined Mr. Johnson's request for review (Doc. 7-3, p. 2), making the Commissioner's decision final for this Court's appellate review.  *See* 42 U.S.C. § 405(g) and § 1383(c).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment

2

for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Mr. Johnson meets the insured status requirements through September 30, 2019. (Doc. 7-3, p. 13). According to the ALJ, Mr. Johnson has not engaged in substantial gainful activity since August 26, 2015, the alleged onset date. (Doc. 7-3, p. 13). The Court notes that the ALJ's reference to 2015 is consistent with some documents in the record (Doc. 7-3, p. 11; Doc. 7-7, p. 21), but other documents reflect that Mr. Johnson stopped working in August 2016. (Doc. 7-8, p. 6; Doc. 7-8, p. 33). Also during the administrative hearing, Mr. Johnson's attorney indicated that Mr. Johnson's amended onset date is August 26, 2016. (Doc. 7-3, p. 40).

The ALJ determined that Mr. Johnson suffers from three severe impairments: post-traumatic stress disorder (PTSD), degenerative disc disease, and degenerative joint disease. (Doc. 7-3, p. 13). Based on her review of the medical evidence, the ALJ concluded that Mr. Johnson does not have an impairment or a combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 14).

In light of Mr. Johnson's impairments, the ALJ evaluated Mr. Johnson's residual functional capacity. The ALJ determined that Mr. Johnson has the RFC to:

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional postural maneuvers; no climbing of ladders, ropes, or scaffolds; no crawling; frequent overhead reaching with bilateral upper extremities; avoid dangerous, moving, unguarded machinery and unprotected heights; can understand, remember, and apply simple instructions and tasks; limited to jobs involving infrequent and well explained work place changes; limited to occasional interaction with coworkers and the general public; and can concentrate and remain on task for two hours at a time, sufficient to complete an eight-hour workday.

(Doc. 7-3, p.16). Based on this RFC and vocational expert testimony, the ALJ concluded that Mr. Johnson is able to perform his past relevant work as a surveillance system monitor. (Doc. 7-3, pp. 20, 58). Relying on the Medical-Vocational Guidelines and expert testimony, the ALJ found that Mr. Johnson is capable of doing other light jobs including housekeeper, product marker, and packager. (Doc. 7-3, p. 21). Accordingly, the ALJ determined that Mr. Johnson has not been under a disability within the meaning of the Social Security Act. (Doc. 7-3, p. 22).

## IV.   ANALYSIS

Mr. Johnson argues that he is entitled to relief from the ALJ's decision because the ALJ did not properly evaluate the credibility of his subjective testimony concerning PTSD. (Doc. 11, p. 5).[1] Mr. Johnson also maintains that the ALJ did not provide good cause for giving less weight to the opinion of Dr.

---

[1] Mr. Johnson has not challenged the ALJ's application of the pain standard to his physical impairments. (*See* Doc. 11, pp. 6-18).

Brannon, Mr. Johnson's treating psychiatrist. (Doc. 11, p. 18). Because the ALJ's negative credibility finding is not based on substantial evidence, the Court will remand for further administrative proceedings. *See Carpenter v. Astrue*, No. 8:10-CV-290-T-TGW, 2011 WL 767652, at *5 (M.D. Fla. Feb. 25, 2011) ("[I]f a credibility determination is inadequate, a remand to the agency for further consideration is the proper remedy.").

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). To establish a disability based on testimony concerning the symptoms of an impairment, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223 (citation omitted). If the ALJ discredits a claimant's subjective testimony, the ALJ "must

articulate explicit and adequate reasons for doing so." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

When credibility is at issue, the provisions of SSR 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Concerning the ALJ's burden when discrediting a claimant's subjective symptoms, SSR 16-3p provides:

> it is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.

In evaluating a claimant's subjective report of his symptoms, an ALJ "must consider the following factors: (i) the claimant's 'daily activities; (ii) the location,

duration, frequency, and intensity of the [claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the [claimant took] to alleviate pain or other symptoms; (v) treatment, other than medication, [the claimant] received for relief ... of pain or other symptoms; and (vi) any measures the claimant personally used to relieve pain or other symptoms.'" *Leiter v. Comm'r of SSA*, 377 Fed. Appx. 944, 947 (11th Cir. 2010) (quoting 20 C.F.R. § 404.1529(c)(3)).

Mr. Johnson developed PTSD following his military service in the Gulf War. As a member of the Army, Mr. Johnson served in Iraq for one year. (Doc. 7-11, p. 48; 7-12, p. 29). Mr. Johnson primarily drove an armored combat vehicle and helped with route clearance. (Doc. 7-11, p. 48). During his deployment, Mr. Johnson was "blown off the road twice" and witnessed deaths. (Doc. 7-11, p. 48; Doc. 7-12, p. 54).

Mr. Johnson testified that the VA originally misdiagnosed him with bipolar disorder and schizophrenia. (Doc. 7-3, p. 44). Mr. Johnson received a PTSD diagnosis from the VA in August or September of 2016. (Doc. 7-3, p. 45; Doc. 7-12, pp. 38, 54). Mr. Johnson testified that his PTSD symptoms include:

> Outrage, bursts of outrage, confusion, emotional breakdown, crying, being mad crying, all this other stuff. Anytime I take a trip in a car, I cry. I don't know why, or I get mad. I scream at my wife. I do things that I know - -

(Doc. 7-3, p. 47).  Mr. Johnson has nightmares "every time [he] sleep[s]."  (Doc. 7-3, p. 48).

Mr. Johnson recalled having a "pretty horrible flashback" during an MRI of his back because of the noise from the MRI machine.  (Doc. 7-3, pp. 48-49, 55). Mr. Johnson does "not see things happening" during his flashbacks, but he does "have the emotional response and the physical response from things that happened, especially in a vehicle."  (Doc. 7-3, p. 49).  Mr. Johnson explained that "crowds of people" can cause him to have a flashback, and he has difficulty being in the same room with family members "longer than two or three minutes at a time."  (Doc. 7-3, p. 49).  Mr. Johnson testified that he could not drive to work "without being a total disaster."  (Doc. 7-3, p. 54).  And "working in environments with more than two to three people" would be challenging because he would "have to be able to walk out."  (Doc. 7-3, p. 54).

Mr. Johnson testified about problems he has had handling jobs due to PTSD. Mr. Johnson remembered "flip[ing] out" and "kick[ing] in the door of a semi" in 2013 because the driver had not properly sealed up the back of a truck with a tag. (Doc. 7-3, p. 53).  Mr. Johnson's employer moved him to a desk position with a camera after that incident.  (Doc. 7-3, p. 53).  Mr. Johnson got written up for not staying at his desk.  (Doc. 7-3, p. 53).  When his employer tried to write Mr.

Johnson up a second time, they "mutually agreed" that Mr. Johnson should leave the company. (Doc. 7-3, p. 53).

While coming off duty from another job, Mr. Johnson took a man to the ground in the parking lot. (Doc. 7-3, p. 53). The man had thrown a wine glass, and Mr. Johnson told him "to stop doing that." (Doc. 7-3, p. 53). The man came running toward Mr. Johnson, and Mr. Johnson "took him into a choke hold." (Doc. 7-3, p. 53). The man passed out, and the police came to investigate. (Doc. 7-3, p. 53). The police did not file a report. (Doc. 7-3, p. 53).

The police told Mr. Johnson that he had "[done] the right thing, but the company didn't like what [he] did." (Doc. 7-3, p. 54). The company asked Mr. Johnson if he could promise not to do something like that again. (Doc. 7-3, p. 54). Mr. Johnson could not make that promise. (Doc. 7-3, p. 54). After that incident, Mr. Johnson started receiving fewer hours and decided to leave. (Doc. 7-3, p. 54).

Concerning his treatment for PTSD, Mr. Johnson testified:

> We haven't really decided yet. I mean, so I went to a psychiatrist who was leaving that day to [go to] South Carolina. I talked to him one time. Had a therapist who told me that the system was flawed and that I needed to seek outside help. That's when I went to go get my own insurance.

> I got my own insurance through the Obamacare plan or the healthcare plan that we have and went to the Maritanville [PHONETIC] family practice and told them my situation. They took blood work. I got a bill for $2,000 and I never went back to them because I can't afford to do that.

10

(Doc. 7-3, p. 45).[2]

Because he was unable to afford private treatment, Mr. Johnson returned to the VA in 2016. (Doc. 7-3, p. 46). After the first doctor who the VA recommended for Mr. Johnson was unavailable, Dr. Brannon became his treating psychiatrist. (Doc. 7-3, p. 46). At the time of his administrative hearing, Mr. Johnson anticipated participating in treatment at the VA three days per week. He was scheduled to see a therapist on Mondays for one hour, participate in a PTSD group on Tuesdays for four hours, and visit Dr. Brannon on Wednesdays for one hour. (Doc. 7-3, p. 46).

Mr. Johnson stated that "[he] needs in depth therapy to figure out why [he] can't get over some of the things that [he] went through" in combat. (Doc. 7-3, pp. 54-55). According to Mr. Johnson, "[his] mental state . . . keeps [him] from working right now." (Doc. 7-3, p. 56).

The ALJ found that Mr. Johnson's impairments satisfy the first part of the pain standard, but not the second:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the above alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they

[2] The facility's name is Meridianville Family Practice. (Doc. 7-9, p. 39).

can reasonably be accepted as consistent with the objective medical evidence and other evidence. . . .

The objective medical evidence is fully consistent with the above residual functional capacity and is inconsistent with the allegations of disabling levels of pain and other symptoms the claimant has alleged. Specifically, the medical evidence is inconsistent with the symptoms or limitations of the frequency, duration, or severity to interfere with the above range of work. As will be discussed in more detail below, the record clearly shows that the claimant's conditions are stable and do not significantly impact his ability to perform work activity.

. . .

Regarding the claimant's mental complaints, records from the Veterans Administration Medical Center indicate the claimant was seen at the emergency room on September 17, 2016 for symptoms related to PTSD/panic attacks. He was treated and released home in stable condition and given a four-day supply of Lorazepam (Exhibit 4F). The claimant followed up at the VAMC and [was] seen for consultation on October 19, 2016. He reported ongoing symptoms related to combat experiences. He endorsed hypervigilence, avoidance behaviors, being easily startled, difficulty being in crowds, nightmares several times per week, low energy, and concentration variable. Mental status examination by nurse practitioner, Kenneth Benning found the claimant was alert and fully oriented, his memory was intact, fund of knowledge was appropriate to his education level, and attention and concentration were sufficient. His PTSD was noted to have responded well to his medication and his symptoms were stable. It was recommended that the claimant continue with regular outpatient individual therapy and medication management; however, he was non-compliant with that recommendation. For example, the record indicates the claimant failed to keep his appointments with the social worker on October 27, 2016, November 15, 2016, and December 13, 2016. Nonetheless, examination by psychiatrist, Dr. Nikki Brannon on December 2, 2016 found the claimant was again alert and fully oriented. He was well groomed, cooperative, had intact memory, with good attention and concentration. At a follow-up appointment on January 12, 2017, the claimant reported doing well, as he felt his mood was more stable and he was less irritable.

He was being prescribed a medication regimen of Paxil, Trazodone, and Abilify with no reported side effects (Exhibit 5F).

. . . he has PTSD; yet, he has clearly been non-compliant with seeing his social worker and therapist. The record also does not show he has required hospitalization as a result of his mental impairment.

(Doc. 7-3, pp. 16-18).

## A. Objective Medical Evidence

An ALJ may rely on objective medical evidence to discredit a claimant's subjective symptoms. 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence ... is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work."). Still, an ALJ cannot make an adverse credibility determination based solely on a lack of objective medical evidence. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also Todd v. Heckler*, 736 F.2d 641, 642 (11th Cir. 1984) (explaining that "pain alone may be disabling" and that it is improper for an ALJ to require objective medical evidence to support a claim of disabling pain); *Geiger v. Apfel*, No. 99-CV-12-ORL-18B, 2000 WL 381920, at *8 (M.D. Fla. Feb. 9, 2000) (holding that the ALJ misapplied the Eleventh Circuit pain standard when the ALJ rejected the claimant's complaints of pain, stating that his "complaints suggest a greater severity of impairments than can be shown by the medical evidence alone").

The summary of the medical evidence that the ALJ presented in her opinion is accurate, but it is incomplete. The ALJ omitted from her analysis objective medical evidence that corroborates Mr. Johnson's description of disabling PTSD symptoms.

The ALJ did not discuss Mr. Johnson's significant mental health treatment both before and after his onset date. Mr. Johnson first received mental health treatment after he returned from his deployment while he still was on active duty because he had a "little mental breakdown." (Doc. 7-12, p. 54). In 2013, Mr. Johnson reported to a VA psychiatrist, Dr. Harris, that he "need[ed] some help" after experiencing several months of mood swings. (Doc. 7-11, pp. 35, 38). Mr. Johnson explained that his symptoms included racing thoughts, periods of increased energy, and episodes of impulsive rage. (Doc. 7-11, p. 35). Mr. Johnson acknowledged being verbally abusive to his family, losing interest in daily activities, and lacking motivation. (Doc. 7-11, p. 35). Dr. Harris diagnosed Mr. Johnson with bipolar disorder and prescribed Seroquel, Klonopin, and individual therapy. (Doc. 7-11, pp. 36-37).

When Mr. Johnson returned to Dr. Harris in August 2014, Mr. Johnson reported mood swings, insomnia, irritability, anger, and impulsiveness. (Doc. 7-11, p. 6). Mr. Johnson had not sought mental health treatment for a year and was not taking any prescribed medications. (Doc. 7-11, p. 6). Mr. Johnson "had been

self-medicating by smoking marijuana." (Doc. 7-11, p. 6). Dr. Harris maintained the diagnosis of bipolar disorder and prescribed Depakote (for bipolar disorder) and Trazadone (for sleeping). (Doc. 7-11, p. 8).

In September of 2016, one month after he stopped working, Mr. Johnson went to the Meridianville Family Practice because of his "worsening anxiety and depression" over a five-year period. (Doc. 7-9, p. 43). Mr. Johnson's symptoms included anxiety, insomnia, restlessness, agitation, sleep disturbance, inability to make decisions, trembling, shaking, and feelings of paranoia and persecution. (Doc. 7-9, p. 55). In the notes section under psychiatric referral, Ms. Sparks, a certified registered nurse practitioner, indicated "pl[ease] request urgent appointment[.]" (Doc. 7-9, pp. 55, 57).

After the appointment at Meridianville Family Practice, Mr. Johnson returned to the VA for treatment. Mr. Johnson saw a social worker, Ms. Rivard. (Doc. 7-10, pp. 100-01). Mr. Johnson's wife was present, and Ms. Rivard provided a mental status summary of the session. (Doc. 7-10, pp. 99-100). On September 16, 2016, Mr. Rivard reported:

> Patient and wife identified that patient has not been on psychotropic medication for 2 years. Wife has had to quit her job to care for patient, who was staying at home with their four children. Patient was verbally assaulting the children, screaming and swearing and continues to do so. Wife organizes patient's appointments and life, as patient is unable to do so.

Patient and wife identified that patient experiences anxiety, sleep issues, and angry outbursts. Patient is verbally assaultive towards wife and patient states he is manic. Wife left her job as patient cannot manage the four children at home. When tried to work in security, he got written up for anger management, wrote his manager up, quoted policies, kept notes of what went on in the office due to paranoia, threw paperwork all over the office, kicked in someone's car door, and strangled/physically assaulted a person.

Patient states he cannot be around people right now. He identifies that he isolates from friends, family of origin, and wife. Patient and wife identify that patient has been "spiraling out of control for 5 years".

(Doc. 7-10, pp. 99-100, 101). After this session, Ms. Rivard "confronted" Mr. Johnson and his wife about "the need to go to the [emergency room] immediately." (Doc. 7-10, p. 99).

On September 17, 2016, the VA emergency room admitted Mr. Johnson with complaints of worsening anxiety over several weeks. (Doc. 7-10, p. 91). Mr. Johnson reported having a short fuse, being irritated easily, and acting aggressively with anger. (Doc. 7-10, p. 91). Mr. Johnson was becoming increasingly aggressive at home with his wife and children. (Doc. 7-10, p. 95). Mr. Johnson was not having suicidal thoughts at the time, but he had had those thoughts in the past. (Doc. 7-10, p. 91). The emergency room physician started Mr. Johnson on Paxil (for depression) and Pro-Lorazepam (for anxiety). (Doc. 7-10, p. 65).

Mr. Johnson attended mental health group counseling for anger management in September 2016. (Doc. 7-10, p. 74). Mr. Johnson "actively participated" in this session. (Doc. 7-10, p. 74).

Mr. Johnson completed a mental health intake with a social worker, Mr. Pate, in September 2016. Mr. Johnson reported symptoms of "frequent anxiety, panic attacks, feeling unsafe, hypervigilance, exaggerated startle reflex, and frequent outbursts of anger." (Doc. 7-10, p. 72). Mr. Johnson also reported "visual hallucinations of 'shadow men' in his peripheral vision" and "night terrors accompanied by excessive sweating and screaming while sleeping." (Doc. 7-10, pp. 72-73).

In September of 2016, Mr. Johnson also saw Ms. Graham, a licensed practical nurse at the Huntsville Mental Health Clinic. (Doc. 7-10, pp. 58, 60). During this psychiatric evaluation, Mr. Johnson reported having a history of "anxiety, anger, and social adjustment" and daily outbursts for five years. (Doc. 7-10, pp. 58, 65). Mr. Johnson felt anxious all the time and compared it to a feeling of "being late for my first job." (Doc. 7-10, p. 65). Mr. Johnson had feelings of hypervigilance and exaggerated startle, crowd avoidance, insomnia, nightmares, and intrusive disturbing memories of Iraq. (Doc. 7-10, p. 65). Mr. Johnson reported that Ativan helped with irritability, anxiety, and sleep. (Doc. 7-10, p. 65).

In October of 2016, Mr. Johnson saw Mr. Benning, a VA nurse practitioner. Mr. Johnson sought treatment for PTSD, anxiety, and anger. (Doc. 7-12, pp. 28, 35). Mr. Benning noted that Mr. Johnson's last mental health appointment in Huntsville had been earlier that month. (Doc. 7-12, p. 28). Mr. Johnson was no

longer taking Prazosin or Trazodone because the medications made him anxious. (Doc. 7-12, p. 29). Mr. Johnson was taking Paroxetine (for depression) and hydroxyzine (for anxiety) without side effects. (Doc. 7-12, p. 29). Mr. Johnson denied "sustained episodes of depression" but was anxious. (Doc. 7-12, p. 29). Mr. Johnson continued to experience irritability and angered easily. (Doc. 7-12, p. 29). Mr. Johnson reported "social isolation[,]" "difficulty in crowds[,]" and "PTSD symptoms related to combat experiences." (Doc. 7-12, p. 29). Mr. Johnson had low energy, and his ability to concentrate varied. (Doc. 7-12, p. 29). Mr. Johnson still had "nightmares several times a week" and restless sleep. (Doc. 7-12, p. 29).

The ALJ relied on Dr. Brannon's treatment notes to discount Mr. Johnson's PTSD symptoms. The ALJ stated that during a December 2, 2016 visit, Dr. Brannon found Mr. Johnson to be "alert and fully oriented[,]" "well groomed, cooperative," with "intact memory, [ ] good attention and concentration." Mr. Johnson's mental status examination report confirms these observations. (Doc. 7-12, p. 56-57). But the ALJ did not discuss other notes from this visit which are consistent with Mr. Johnson's subjective complaints. (Doc. 7-12, pp. 15-17, 51-52). Mr. Johnson reported to Dr. Brannon that he had "[b]een better[.]" (Doc. 7-12, p. 54). Mr. Johnson stated that he had regular nightmares, intrusive thoughts, irregular sleep patterns, poor appetite, poor concentration, thoughts of

worthlessness and hopelessness, and passive thoughts of suicide. (Doc. 7-12, p. 54). He was sleeping poorly at night because of hyperstartle. Because of his PTSD, Mr. Johnson explained that he "[a]voids crowds and any social activity." (Doc. 7-12, p. 54). Dr. Brannon rated Mr. Johnson's depression and anxiety at a level ten with ten being the worst. (Doc. 7-12, p. 54).

Dr. Brannon's notes from Mr. Johnson's January 12, 2017 visit indicate that Mr. Johnson felt his mood was more stable, and he was less irritable. (Doc. 7-12, p. 42). Mr. Johnson's dosage of Paxil (for depression) and Trazadone (200 mg for sleep) had increased since his last visit in December 2016. (Doc. 7-12, p. 42). Mr. Johnson had stopped taking Abilfy after one week because it caused high anxiety and irritability. (Doc. 7-12, p. 42). Mr. Johnson reported that he "[c]ontinue[d] to isolate [himself] from others." (Doc. 7-12, p. 42).

On February 23, 2017, weeks before the administrative hearing, Dr. Brannon completed a mental health source statement for Mr. Johnson. (Doc. 7-13, pp. 17-18).[3] Dr. Brannon reported that Mr. Johnson has extreme limitations when working: "in coordination or proximity of others[;]" "a normal workday and workweek without interruptions[;]" "a consistent pace without an unreasonable

---

[3] As Mr. Johnson points out in his brief (and the Commissioner does not dispute), the form which Dr. Brannon completed is similar to Form HA-1152 used by the Social Security Administration. (Doc. 11, p. 20). According to the Social Security Administration's Program Operations Manual System, Form HA-1152 is a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)". https://secure.ssa.gov/poms.nsf/lnx/0429501015 (last visited Mar. 28, 2019).

number and length of rest periods[;]" and "with coworkers . . . without distracting them or exhibiting behavioral extremes." (Doc. 7-13, pp. 17-18). Dr. Brannon found that Mr. Johnson also has extreme limitations in "interact[ing] appropriately with the public" and "travel[ing] in unfamiliar places or us[ing] public transportation." (Doc. 7-13, p.18).

Dr. Brannon concluded that Mr. Johnson has marked limitations in following "a schedule, maintain[ing] regular attendance, and be[ing] punctual within customary tolerances[;]" "accept[ing] instructions and respond[ing] appropriately to criticism from supervisors[;]" "maintain[ing] socially appropriate behavior and . . . adher[ing] to basic standards of neatness and cleanliness[;]" and "respond[ing] appropriately to changes in the work setting." (Doc. 7-13, pp. 17-18). The ALJ gave little weight to this assessment. (Doc. 7-3, p. 19).[4]

As part of her assessment of the medical evidence, the ALJ found that Mr. Johnson missed three social worker appointments in late 2016 and discounted Mr. Johnson's PTSD symptoms based on "non-complian[ce] with seeing his social worker and therapist," (Doc. 7-3, p. 18), but the ALJ failed to properly evaluate the missed appointments. The record demonstrates that on October 27, 2016, and on November 15, 2016, Mr. Johnson missed appointments with Mr. Pate, a social

---

[4] The ALJ also assigned little weight to Dr. Williams's psychological evaluation of Mr. Johnson. (Doc. 7-3, p. 19).

worker.  (Doc. 7-12, pp. 72, 62).  Mr. Johnson also missed an appointment with Dr. Eason, a general practitioner, on December 13, 2016.  (Doc. 7-12, p. 47).

During the administrative hearing, the ALJ questioned Mr. Johnson about missing appointments:  "Your VA records show[s] that there were quite a [few] appointments for physical therapy, for evaluations, MRIs and so on ....  Why did you miss all those appointments?"  (*See* Doc. 7-3, p. 42).  Mr. Johnson explained that he missed the MRI appointment because he had to travel to Birmingham for that appointment and he could not find a babysitter for his children.  (Doc. 7-3, pp. 42-43).  The ALJ did not ask Mr. Johnson about missed appointments pertaining to his mental health.  Consequently, the Court cannot determine, and the ALJ did not determine, whether Mr. Johnson had a reasonable explanation for missing two mental health appointments with a social worker.  *See* SSR 16-3p, 2017 WL 5180304, at *10 ("However, we will consider and address reasons for not pursuing treatment that are pertinent to an individual's case."); *see also Sparks v. Barnhart*, 434 F. Supp. 2d 1128, 1135 (N.D. Ala. 2006) ("In assessing the plaintiff's failure to follow through with recommended mental health treatment, the ALJ failed to consider the impact of the plaintiff's mental illness itself."); *Sparks*, 434 F. Supp. 2d at 1135 ("Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment[.]").  Because the ALJ did not determine the reason(s) why Mr. Johnson missed the two social

worker appointments, the ALJ could not discount Mr. Johnson's PTSD symptoms based on "non-complian[ce] with seeing his social worker and therapist."[5]

The medical evidence in its entirety is consistent with the symptoms that Mr. Johnson reported during the administrative hearing. The ALJ's finding that a lack of objective medical evidence diminishes the credibility of Mr. Johnson's report of his symptoms does not rest on substantial evidence.

## B.    Daily Activities

The ALJ also found that Mr. Johnson's daily activities were inconsistent with his PTSD symptoms. (Doc. 7-3, p. 19). An ALJ may consider a claimant's

_____

[5] Mr. Johnson provides the following explanation in his brief:

> The Plaintiff credibly testified that at times they were unable to get anyone to watch their children for him to make the appointments. (R.41). He further testified at the hearing that he was seen at the VA in 2016 when he met with a psychiatrist one time before the psychiatrist left for South Carolina. (R.44). He indicated that he was seen by a therapist who told him the "system was flawed" and to seek outside help. (R.44). The Plaintiff then sought treatment from Meridianville Family Practice but once he received the bill he realized he was unable to afford care there. (R.44). He then returned to the VA and began treatment with Dr. Brannon who put him on Paxil. (R.45). According to the Plaintiff he did not want to see the therapist that told him the system was flawed and the VA never set him up with another therapist. (R. 45).

(Doc. 11, pp. 13-14). The Commissioner does not challenge Mr. Johnson's explanations, but points to a number of missed appointments. (Doc. 14, pp. 14-15). The record citations that the Commissioner provided include the two missed appointments with Mr. Pate, but no other missed mental health appointments during the disability period. (Doc. 14, p. 15); (*see* Doc. 7-10, p. 10) (missed December 10, 2013 nerve conduction appointment for back pain); (Doc. 7-10, p. 100) (discussing upcoming 2016 appointments); (Doc. 7-11, p. 3) (missed October 20, 2014 psychiatric appointment with Dr. Harris); (Doc. 7-12, p. 20) (missed 2016 gastroenterologist appointment); (Doc. 7-12, pp. 47-48) (missed December 2016 primary care appointment with Dr. Eason); (Doc. 7-12, p. 54) (no reference to a missed appointment); (Doc. 7-12, pp. 61-62)

daily activities when reaching a conclusion regarding credibility. 20 C.F.R. § 404.1529(c)(3) (listing "daily activities" as a relevant factor to consider in evaluating a claimant's subjective pain testimony). But an ALJ may not rely only on a claimant's daily activities in making a disability determination. *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Procedurally then, this Court cannot affirm the ALJ's decision based solely on her evaluation of Mr. Johnson's daily activities.

More importantly, though, substantial evidence does not support the ALJ's finding that Mr. Johnson's daily activities diminish his credibility. An ALJ must consider the record as a whole when evaluating daily activities. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (The Appeals Council erred in finding that claimant's "daily activities . . . have not been significantly affected" when the Appeals Council "ignored other evidence that her daily activities have been significant affected."). "[P]articipation in everyday activities of short duration" does not prevent a claimant from proving disability. *Lewis*, 125 F.3d at 1441. Instead, "[i]t is the ability to engage in gainful employment that is the key, not whether a Plaintiff can perform chores or drive short distances." *Early v. Astrue*, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007).

---

(missed November 15, 2016 appointment with Mr. Pate at mental health clinic); (Doc. 7-12, p. 72) (missed October 27, 2016 appointment with Mr. Pate at mental health clinic).

Here, the ALJ cited Mr. Johnson's ability to prepare simple meals, fold towels, do yard work, play guitar, and listen to music as "indicative of the ability to perform the basic mental requirements of unskilled, entry-level positions." (Doc. 7-3, p. 19). The ALJ's review of Mr. Johnson's daily activities is incomplete. *See Horton v. Barnhart*, 469 F. Supp. 2d 1041, 1047 (N.D. Ala. 2006) ("The ALJ's selective description of the Plaintiff's activities is disingenuous, as he accepts her listing of her activities, but not her limiting description of them.").

Because Mr. Johnson only sleeps one to two hours nightly (because of nightmares), he wakes up unrested and lacks energy. (Doc. 7-8, p. 59). Mr. Johnson limits his social activities because of his angry outbursts and anxiousness. (Doc. 7-8, p. 59). Mr. Johnson minimizes time spent with his family. (Doc. 7-8, p. 59). Mr. Johnson can bathe himself, but he has to be reminded to do so and could go weeks without bathing. (Doc. 7-8, p. 60). Mr. Johnson fixes simple meals that are microwavable. (Doc. 7-8, p. 61). Mr. Johnson spends 30 minutes folding towels, and he can spend all day in the yard without completing his task. (Doc. 7-8, p. 61). Mr. Johnson gets overwhelmed with even a small task. (Doc. 7-8, p. 62). Mr. Johnson avoids going outside except when necessary. (Doc. 7-8, p. 62). When he must be outside, Mr. Johnson quickly gets overwhelmed. (Doc. 7-8, p. 62). Mr. Johnson also will yell at the neighborhood children "to be quiet because the amount of noise makes [him] anxious." (Doc. 7-8, p. 62). Mr. Johnson does

not drive because he has "trouble concentrating on the road and . . . forget[s] where [he] is going and sometimes even [which] direction [he] [is] traveling." (Doc. 7-8, p. 62). This is not surprising because Mr. Johnson primarily drove an armored combat vehicle in Iraq to help with route clearance, and he was "blown off the road twice." Mr. Johnson shops "very rarely" and when he does, the shopping "takes a very long time." (Doc. 7-8, p. 62). When Mr. Johnson does go places, he "usually sit[s] in silence" and does not engage in conversation. (Doc. 7-8, p. 63). Mr. Johnson gets impatient and angry with family, friends, and neighbors. (Doc. 7-8, p. 64). As stated, Mr. Johnson's wife had to quit her job to care for him and for their children.

Thus, the ALJ's limited description of Mr. Johnson's daily activities does not represent the full scope of limitations caused by his PTSD. *See Bosarge v. Berryhill*, No. CA 16-0382-C, 2017 WL 1011671, at *7 n.6 (S.D. Ala. Mar. 15, 2017) (The ALJ erred in "describ[ing] Plaintiff's daily activities in a manner which would lead the reader to believe that she performed them without any limitation."). Moreover, activities such as preparing simple meals, folding towels, and playing guitar are not sufficient to disqualify a disability finding. *See Venette v. Apfel*, 14 F. Supp. 2d 1307, 1314 (S.D. Fla. 1998) (activities like housework and light grocery shopping are "minimal daily activities" and are not "dispositive evidence" of one's ability to perform certain types of work) (citing *Walker v. Heckler*, 826

F.2d 966 (11th Cir. 1987)); *see also Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1252 (N.D. Ala. 2003) ("'[S]hopping for the necessities of life is not a negation of disability . . . sporadic or transitory activity does not disprove disability.'") (quoting *Smith v. Califino*, 637 F.2d 968, 971-72 (3d Cir. 1981)); *Bennett*, 288 F. Supp. 2d at 1252 ("'Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity ....'") (quoting *Smith*, 637 F.2d at 971-72). The ALJ's findings regarding Mr. Johnson's daily activities are not supported by substantial evidence.

### C.    Instructions on Remand

On remand, the ALJ must consider the VA's 70% PTSD disability rating for Mr. Johnson. On July 22, 2016, the VA gave Mr. Johnson a 70% service-connected PTSD disability rating (effective April 25, 2016) and a 90% combined disability rating due to problems with his knee, back, and shoulder. (Doc. 7-7, pp. 3, 6-9; Doc. 7-12, p. 15; Doc. 7-3, p. 49). The VA assigned Mr. Johnson a 70% PTSD disability rating based on:

> • Forgetting names • Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood • Suspiciousness • Depressed mood • Disturbances of motivation and mood • mild memory loss • Forgetting recent events • Chronic sleep impairment • Difficulty in understanding complex commands • Panic attacks more than once a week • Obsessional rituals which interfere with routine activities • Difficulty in adapting to work • Inability to establish and maintain effective relationships • Flattened affect • Intermittent inability to perform maintenance of minimal personal hygiene • Difficulty in adapting to a

work[-]like setting • Anxiety • Difficulty in establishing and maintaining effective work and social relationships • Intermittent inability to perform activities of daily living • Forgetting directions.

(Doc. 7-7, p. 6). The VA explained the PTSD diagnosis:

We concede you experienced a stressful event in service or fear of hostile military or terrorist activity. We took your statement as evidence of the claimed stressful experience or stressor. The VA examiner related the stressor to fear of hostile military or terrorist activity, and the VA examiner linked your symptoms to the stressor. Stressors were conceded based on your experiences described in Iraq.

(Doc. 7-7, p. 6).

The ALJ acknowledged the VA award letter during the administrative hearing (Doc. 7-3, pp. 38-39, 48, 55), but in her decision, she did not analyze Mr. Johnson's VA PTSD disability rating or the basis for the rating. Though not binding, an ALJ must give a VA disability rating great weight and must scrutinize the rating carefully when a claimant's impairment is combat-related. *See DePaepe v. Richardson*, 464 F.2d 92, 101 (5th Cir. 1972) (giving a claimant the benefit of the doubt when the claimant's impairment arises out of a combat injury and holding that "[w]hile such a rating is not binding on the Secretary, it is evidence that should be considered and it is entitled to great weight.");[6] *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981) (same); *Little v. Colvin*, No. 1:13-

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

CV-1475-SLB, 2015 WL 1345432, at *6 (N.D. Ala. Mar. 23, 2015) (citing

*Rodriguez* and *DePaepe* and remanding because the ALJ did not address the

claimant's 70% service connected PTSD disability rating or the underlying VA

examination supporting that rating); *Little v. Berryhill*, No. 1:17-CV-01602-MHH,

2019 WL 1326089, at *8 (N.D. Ala. Mar. 25, 2019) (*Little II*) (discussing *DePaepe*

holding concerning combat injuries and Eleventh Circuit decisions applying

*DePaepe* and *Rodriguez* and noting that a VA disability rating "is a medically-

grounded determination substantiated by VA treatment records").

## V.    CONCLUSION

For the reasons discussed above, the Court remands the decision of the

Commissioner for further administrative proceedings consistent with the Court's

memorandum opinion.

**DONE** this 29th day of March, 2019.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE